IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

PATRICK DWAYNE MURPHY,     )
           )
           Petitioner,     )
           )
vs.           )     Case No. CIV-12-191-RAW-KEW
           )
ANITA TRAMMELL, Warden, Oklahoma     )
State Penitentiary,     )
           )
           Respondent.     )

## OPINION AND ORDER

Following this Court's denial of a writ habeas corpus on August 1, 2007, in Case

No. CIV-03-443-RAW-KEW, the Oklahoma Court of Criminal Appeals ("OCCA")

denied a second application for state post-conviction relief thereby affirming the

judgment of the state trial court which had held that the petitioner is not mentally

retarded. *Murphy v. State*, 281 P.3d 1283 (Okla. Crim. App. 2012). Thereafter, on May

17, 2012, Petitioner filed an Amended Petition for Writ of Habeas Corpus (Dkt. # 10)

herein. On August 8, 2012, the case was transferred to the Tenth Circuit pursuant to 28

U.S.C. § 1631. On November 1, 2012, the Tenth Circuit remanded the case for this court

to consider Petitioner's procedural *Atkins* claim (Dkt. # 20). On December 19, 2012,

Respondent filed a response (Dkt. # 24). Petitioner's reply was filed on January 23, 2013

(Dkt. # 28).

As a preliminary matter the Court notes that Anita Trammell is currently the Warden at Oklahoma State Penitentiary. The Court finds, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Anita Trammel is the proper substituted Respondent and the Court Clerk shall be directed to note such substitution on the record.

## I. RECORDS REVIEWED

In addition to the records reviewed in the prior habeas proceeding, this Court has reviewed the following records: (1) the Amended Petition for Writ of Habeas Corpus filed on May 17, 2012; (2) the Response filed on December 19, 2012; (3) the Reply filed on January 23, 2013; (4) transcript of Jury Trial Proceedings held on September 14 - 17, 2009, Volumes I, II, III, and IV, including exhibits; (5) transcript of Telephonic Deposition of Rob Mendoza taken on December 16, 2010; (6) transcript of Telephonic Deposition of Terry Brockie taken on December 16, 2010; (7) transcript of proceeding held on January 27, 2011; (8) transcript of proceedings held on November 4, 2010; (9) transcript of proceeding held on September 27, 2007; (10) transcript of proceeding held on September 10, 2010; (11) transcript of proceeding held on September 25, 2009; (12) transcript of proceedings held on October 29, 2002, including exhibits consisting in part of portions of transcripts from petitioner's trial and/or deposition testimony; and (13) all other records before the Oklahoma Court of Criminal Appeals which were transmitted to this Court. Although not specifically identified herein, this Court has also reviewed all documents identified by the parties as "pertinent" to a review of the petition herein. *See*, Dkt. # 34.

Based upon a thorough review of the state court records, this Court finds the state court records provide sufficient factual and legal authority to resolve the matters in the petition and, therefore, an evidentiary hearing is unnecessary. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992); *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)(*Sumner I*); *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982)(*Sumner II*).

## II.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA), 110 Stat. 1214, sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner.  In particular, 28 U.S.C. § 2254(a) permits a federal court to entertain only those applications alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States."  In considering such an application, a federal court shall not grant a writ of habeas corpus

> . . . . . unless it appears that ---
> **(A)**  the applicant has exhausted the remedies in the courts of the State; or
> **(B)(i)**  there is an absence of available State corrective process; or
> **(ii)**  circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  Further, as set forth in this Court's prior opinion, this Court is prohibited from granting habeas relief on any claim adjudicated on the merits by the State court *unless* the adjudication resulted in (1) a decision that was contrary to, or an unreasonable application of, clearly established holdings of the Supreme Court; or, (2) a

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

When reviewing a state court's application of federal law under 28 U.S.C. § 2254(d), federal courts are not allowed to issue the writ simply because the court believes in its independent judgment that the state court applied the law erroneously or incorrectly. Rather, the court must be convinced that the application was also objectively unreasonable. *Milton v. Miller*, 744 F.3d 660, 668 (10th Cir. 2014) (quoting *McLuckie v. Abbott*, 337 F.3d 1193, 1197 (10th Cir. 2003). Further, state court determinations of fact are "presumed correct" unless the presumption is rebutted by "clear and convincing evidence." 28 U.S.C. § 2244(e)(1); *Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013).

### III. *ATKINS* PROCEDURAL CHALLENGE

The main issue before this court is: Was the OCCA's decision to terminate proceedings without providing the petitioner a jury trial on his *Atkins*' claim contrary to, or an unreasonable application of, clearly established federal law and, therefore, a violation of his constitutional rights? Petitioner argues the procedures utilized by the Oklahoma courts in adjudicating his mental retardation claim prevented him from being able to fairly challenge his sentence under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), thereby rendering the process wholly inadequate to enforce the mandates of *Atkins.*

In *Atkins*, the Supreme Court held that it was unconstitutional to execute a mentally retarded offender. The Court recognized, however, that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of offenders about whom there is a national concensus." *Id.*, 536 U.S. at 317, 122 S.Ct. at 2250. As a result, the Court left to the States the task of developing appropriate procedures to enforce the constitutional restriction. The Court indicated in a footnote that the "statutory definitions of mental retardation are not identical, but generally conform to the clinical definition"[1] adopted by the American Association on Mental Retardation.[2]

Following the *Atkins* decision, Petitioner filed his first application for post-conviction relief raising four issues, OCCA Case No. PCD-2001-1197. *Murphy v. State*, 54 P.3d 556, 560 (Okla. Crim. App. 2002)(*Murphy II*). After review, the OCCA denied relief on all issues except for Petitioner's claim that "due to his mild mental retardation, his execution would violate the state and federal constitutional prohibitions against cruel and/or unusual punishments and would offend contemporary standards of decency." *Id.*, at 566. As to this claim, the OCCA remanded the matter to the District Court of McIntosh County "for an evidentiary hearing on the sole issue of Petitioner's claim of mental retardation. . . . ." *Id.*, at 570. The OCCA directed the trial court judge to

---

[1] *Id.*, at n. 22.

[2] "The American Association of Mental Retardation defines mental retardation as follows:
'*Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.'"
*Id.*, at n. 3.

"determine if Petitioner [had] raised sufficient evidence (at trial, on appeal, or at the evidentiary hearing) of his mental retardation, in accordance with the definition set forth herein, for the issue of mental retardation to be decided as a question of fact by a jury at a resentencing hearing." *Id*. (footnote omitted). The OCCA defined "sufficient evidence" as "enough evidence to create a fact question on whether the Petitioner is mentally retarded." *Id.*, at FN 27. According to the OCCA:

> A person is "mentally retarded": (1) If he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living, self-direction; academics; health and safety; use of community resources; and work.

*Id.*, at 567-568. The OCCA indicated it is the defendant's burden to prove that he is mentally retarded by a preponderance of the evidence despite the "clear and convincing" standard adopted by the Oklahoma legislature. *Id.*, at 568. Additionally, the OCCA recognized, in determining whether a defendant is "mentally retarded," that

> [i]ntelligence quotients are one of the many factors that may be considered, but they are not alone determinative. However, no person shall be eligible to be considered mentally retarded unless he or she has an intelligence quotient of seventy or below, as reflected by at least one scientifically recognized, scientifically approved, and contemporary intelligent quotient test.

*Id.* According to the OCCA, this standard was to be "used at all future and pending capital trials, *until such time as it may be replaced by a suitable legislative enactment.*" *Id.* (italics added)[3]

Following an evidentiary hearing on October 29, 2002, the trial court entered findings which, among others, found there was no evidence to reliably support a conclusion that petitioner was 'mentally retarded' under the definitions contained in *Murphy II*. *See*, Findings from Case No. CF-1999-164A filed in the OCCA on November 6, 2002. On return from remand, the OCCA found the sole question was "whether or not Petitioner has raised sufficient evidence to create a fact question on the issue of his claim of mental retardation." *Murphy v. State*, 66 P.3d 456 (Okla. Crim. App. 2003) (*Murphy III*). As to this question, the OCCA held petitioner had failed to create a fact question on the issue of his claim of mental retardation and his application for post-conviction relief was denied. *Murphy v. State*, 66 P.3d 456 (Okla. Crim. App. 2003)(*Murphy III*). In reaching this decision, the OCCA made the following factual findings:

> . . . . . It is absolutely clear from Judge Taylor's order that he does not consider Petitioner to be mentally retarded under this Court's definition and the evidence presented. Judge Taylor is strongly of the opinion that a further hearing in this case would be futile.
> Among other things, Judge Taylor found: Petitioner's alcoholism directly impacted the 67 I.Q. finding made by Dr. Sharp in the partial and incomplete test given at the McIntosh County jail; the test administered by

---

[3] Effective July 1, 2006, the Oklahoma legislature enacted legislation preventing a defendant who has "received an intelligence quotient of seventy-six (76) or above on any individually administered, scientifically recognized, standardized intelligence quotient test administered by a licensed psychiatrist or psychologist" from being considered mentally retarded and, therefore, such individuals are not subject to any proceedings under § 701.10b. *See*. OKLA. STAT. tit. 21, § 701.10b(C).

Dr. Sharp is not reliable due to the jail conditions, the incomplete testing, recent alcohol use, and lack of confidence in the test expressed by Dr. Sharp; a later complete I.Q. test which was given to the Defendant demonstrated an I.Q. of 80; the elementary school testing did not demonstrate mental retardation, only some academic weakness; in reference to the definition of mental retardation in the Remand Order, the evidence does not fit into any of the three categories; and there is a total lack of reliable evidence of mental retardation in this case.

*Id*., at 458.

The OCCA continued its analysis of Petitioner's claim by reviewing whether the evidence relied on by Judge Taylor in reaching his ultimate conclusion was clearly erroneous. Using the definition of mental retardation adopted in *Murphy II*, the OCCA found

. . . the record clearly indicates Petitioner's intelligence does not *substantially* limit his ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses and to understand the reaction of others. Furthermore, . . . . . the record clearly indicates Petitioner does not have *significant* limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work. . . . . . . . .

While Petitioner has some weaknesses in controlling impulses and logical reasoning, the record does not indicate his intelligence is substantially limited, separate and apart from his excessive alcohol consumption. Furthermore, Petitioner's adaptive functioning appears fairly normal, in spite of his excessive alcohol consumption.

*Murphy III*, at 459. Moreover, the OCCA agreed with Judge Taylor's finding that "'mental retardation' did not manifest itself in the [Petitioner] before age eighteen," finding "Petitioner was never held back in school. He was able to adapt and function and

improve his skills over time. There was no formal diagnosis of mildly mentally retarded." *Id*. at 460.[4]

In 2004, Petitioner filed a second application for post-conviction relief. In this application, Petitioner claimed, among other issues, that he was denied the right to a jury trial on the issue of his mental retardation based upon the OCCA's decision in *Murphy III*. He claimed such denial "was arbitrary and capricious, a denial of equal protection, and a deprivation of rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments." *Murphy v. State*, 124 P.3d 1198, 1208 (Okla. Crim. App. 2005)(*Murphy IV*). Recognizing that Oklahoma's mental retardation jurisprudence had been in a "state of flux" since *Atkins*, the OCCA held

> While the trial judge and our prior cases have voiced strong doubts about Petitioner's mental retardation claim, a majority of this Court now finds he has provided sufficient evidence in his post-conviction appeals to raise a fact question on this issue, thereby warranting a trial on Petitioner's mental retardation claim.[FN21]
>
> > FN21. I personally disagree with the Court's resolution of proposition two for the following reasons. First, Petitioner is not mentally retarded. Second, he never made a *prima facie* showing of his claim, as his abbreviated IQ test was insufficient to get him past the required threshold of providing at least one IQ test score under 70. Third, the matter is *res judicata*, as three judges from this Court (myself, Judge C. Johnson, and Judge Lile) have previously rejected this identical claim in a previous appeal. And finally, the fact that Petitioner is the only defendant who was unable to sufficiently raise a fact question concerning his mental

---

[4] Petitioner states in his Amended Petition that "Respondent has not contested that Mr. Murphy has intellectual limitations which arose prior to the age of 18 years." This statement, however , is contradicted by the OCCA finding in *Murphy III*.

9

retardation claim does not mean he was treated differently.
But I defer to the majority on this issue.

*Murphy IV*, at 1208.

As a result, on December 7, 2005, the matter was remanded "to the District Court of McIntosh County for a jury trial on Petitioner's mental retardation claim, consistent with this opinion and the procedures adopted by this Court in our recent mental retardation jurisprudence." *Id*., at 1209. This Court has carefully reviewed the second post-conviction application to ascertain what evidence differed from that previously presented to the Oklahoma courts and finds this decision was solely based upon evidence presented during the previous state court hearings.

On September 17, 2009, following trial before McIntosh County District Court Judge Thomas M. Bartheld, the jury returned a verdict finding Petitioner was not mentally retarded. On September 25, 2009, however, a mistrial was declared by the trial court because the parties had been given insufficient peremptory challenges and the jury verdict was set aside. Tr. of September 25, 2009, at p. 7.

On March 10, 2011, in ruling upon the State's Motion to Terminate Further Proceedings pertaining to the alleged mental retardation of the Defendant, the trial court entered findings of fact and conclusions of law finding, in part, as follows:

> . . . . . in preparation for the hearing on this Motion, the Court specifically reviewed the trial transcripts of the testimony of Dr. Bill Sharp, (sic) All are licensed psychologists/psychiatrists. Dr. Sharp testified on behalf of the Defendant in the trial in 2009. Dr. Faust Bianco and Dr. Terese Hall, both testified at the Jury Trial in 2009 on behalf of the State. The Court specifically finds that said review reflects that these witnesses

were the only witnesses presented in this matter at the Jury Trial pertaining to Intelligence Quotient scoring on individually recognized intelligence tests performed upon the Defendant that were administered by a licensed psychiatrist or psychologist.

. . . . . the Court finds that Dr. Sharp testified that he administered the Wechsler Abbreviated Scale of Intelligence Test, which is an abbreviated test and the result of his intelligence quotient testing revealed an IQ of 67. The Court further finds that the IQ testing performed by Dr. Bianco and Dr. Hall were Wechsler Full Scale Intelligence Tests and that those tests constituted "scientifically recognized standardized IQ tests". Dr. Bianco testified that the intelligence quotient of the Defendant was 80. Dr. Hall testified that the intelligence quotient of the Defendant was 82. The Court further finds that Dr. Bianco was an expert witness originally retained by the Defendant and that Dr. Hall was an expert witness retained by the State.

. . . . . the Court finds that upon inquiry by the Court at the Motion hearing held January 27, 2011, the record of discovery submitted by the parties in this case and the statements of counsel indicate that there is no additional evidence available which would reflect an intelligence quotient score other than those scores on any individually recognized intelligence quotient test administered by a licensed psychiatrist or psychologist.

. . . . . the Court finds that 21 O.S. 701.10b applies to the facts of this case and that by its terms, the evidence available regarding the intelligence quotient scores of the Defendant on individually recognized intelligence quotient tests administered by a licensed psychiatrist or psychologist are in excess of 76, the standard set by the statute and adopted as an appropriate standard by the Court of Criminal Appeals in the case of *Smith v. State*, 2010 OK CR 24.

. . . . . the Court finds that the standard set (sic) 21 O.S. 701.10b is a procedural standard that applies to the proceedings in this matter which serves to prohibit the consideration of the issue of the mental retardation of the Defendant by the Court or a jury. This is a consistent application of the law and subsequent interpretation of same by the Court of Criminal Appeals in the evolving jurisprudence in this area of the law.

O.R. 1420-1421. Based upon these findings, the trial court struck the rescheduled jury trial on the issue of whether or not the Petitioner was mentally retarded as defined in Oklahoma law and the matter was remanded to the OCCA for further proceedings. *Id.*

On appeal, the OCCA held that § 701.10b is consistent with *Atkins* and Petitioner did not make a threshold showing of mental retardation under § 701.10b. As a result, the OCCA held "Petitioner was not entitled to the adversarial process associated with a jury trial." *Murphy v. State*, 281 P.3d 1283, 1293 (Okla. Crim. App. 2012)(*Murphy V*). The Court went on to emphasize that

> the District Court afforded Petitioner a hearing upon the State's motion. Petitioner was permitted to submit evidence and argument upon the issue. The State relied upon the evidence from Petitioner's jury trial on the issue of mental retardation. Petitioner had the opportunity to confront and examine each of the witnesses at trial. This included clarifying and challenging the experts' opinions or methods.
>
> Petitioner has not shown that § 701.10b denies him the protections afforded by procedural due process. As such, he has not proven that the statute is unconstitutional.

*Id.* Moreover, the OCCA recognized that the Oklahoma legislature's approach was consistent with Supreme Court precedent which requires a substantial showing of insanity before a condemned prisoner is entitled to a hearing on a competence to be executed claim. *Id.* (citing *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).

Petitioner argues, however, the Oklahoma statute, the OCCA's interpretation of it, and the application of the statute to his case violate the clearly established law of *Atkins*.

Specifically, Petitioner asserts "Oklahoma's conclusion a single IQ score of 76 automatically precludes a finding Mr. Murphy is mentally retarded, despite the number and quality of all other testing and all other evidence which supports that he is a person with significantly subaverage general intellectual functioning, is contrary to and/or an unreasonable application of the clearly established law of *Atkins*." Dkt. # 10, at p. 21. Petitioner continues by stating "Oklahoma's construction of OKLA. STAT. tit. 21, §701.10b(C) to absolutely bar the establishment of mental retardation for any defendant who has ever received an IQ score of 76 or above is inconsistent with accepted professional standards." *Id.* Additionally, in a footnote, Petitioner states "[t]he OCCA's statement Petitioner was afforded the opportunity to present evidence is an unreasonable determination of the facts." Dkt. # 10, at fn. 8. Petitioner then cites to several exhibits which were never presented to the Oklahoma courts. Respondent claims Petitioner never argued in state court that the use of a cut-off score was inconsistent with professional standards and, therefore urges this Court to find this portion of his argument is unexhausted.

In *Cullen v. Pinholster*, --- U.S. ---, 131 S.Ct. 1388, 179 L.Ed2d 557 (2011), the Supreme Court held federal habeas review of a state-court proceeding adjudicated on the merits in state court, under 28 U.S.C. § 2254(d)(1), is limited to the record before the state court. In an effort to overcome this limitation, thereby expanding the records herein, Petitioner argues the procedures followed in his particular case render the process ineffective to protect his Eighth Amendment rights. Although Petitioner argues he was

not allowed to develop his claim in state court, in making its ruling the trial court considered all of the evidence previously submitted by Petitioner and specifically found that statements of counsel indicated there was no additional evidence available. O.R. 1419-1421. Based upon the record in this particular case, this Court finds Petitioner had numerous opportunities to develop his claim of mental retardation. Accordingly, this Court finds the issue was adjudicated on the merits and this Court is limited to the records before the state court.

The argument raised by Petitioner is similar to an argument subsequently addressed by the Supreme Court in *Florida v. Hall*, --- U.S. ---, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014). The Court in *Hall* found that a Florida rule interpreted by the Florida Supreme Court to foreclose further exploration of a capital defendant's intellectual disability if his IQ score was more than 70, created an unacceptable risk that persons with intellectual disabilities would be executed in violation of the Eighth Amendment. In reaching this decision, the Court addressed the question of how intellectual disability must be defined in order to implement the holding of *Atkins* and the Eighth Amendment principles prohibiting the execution of persons with intellectual disabilities. The Court reiterrated the three criteria set out in *Atkins* and utilized by the medical community to define intellectual disability: "significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." *Id*., S.Ct. at 1994. The Court also discussed how IQ test scores

should not be read as a single fixed number but as a range and that each IQ test has a "standard error of measurement." Moreover, the Court recognized the standard error of measurement is typically five points. *Id.*, S.Ct. at 1995. *See also*, *Hearn v. Thaler*, 669 F.3d 265, 269 (5th Cir. 2012)(recognizing a measurement error of approximately five points on most IQ tests). Unlike the cut-off established in *Hall*, the Oklahoma statutes provide that an intelligence quotient of seventy (70) or below is "evidence of significantly subaverage general intellectual functioning; however, is it not sufficient without evidence of significant limitations in adaptive functioning and without evidence of manifestation before the age of eighteen (18) years." OKLA. STAT., tit. 21, § 701.10b(C). Defendants are not, however, prevented from establishing mental retardation unless they have received an intelligence quotient of seventy-six (76) or above,[5] thereby taking into account the standard error of measurement which, as indicated, is typically five points. Further, Oklahoma recognizes that "[i]ntelligence quotients are one of the many factors that may be considered, but are not alone determinative." *Murphy II*, at 568 (legal procedures adopted to resolve future *Atkins* were superceded in *Blonner v. State*, 127 P.3d 1135 (Okla. Crim. App. 2006)).

Although the Supreme Court has never held a jury trial must be provided to every defendant who raises an *Atkins* claim, Petitioner claims other Oklahoma offenders who had IQ scores of 76 or above received a jury trial on the issue of mental retardation. Furthermore, Petitioner claims it was fundamentally unfair for the OCCA to offer state

---

[5] *Id.*

procedures to litigate his *Atkins* claim and then remove those procedures from him midstream without valid reasons thus violating his due process rights under the United States Constitution. Citing *Hicks v. Oklahoma*, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980), Petitioner asserts the state, through the OCCA, created a liberty interest in a jury trial to determine whether he was mentally retarded. The Court in *Hicks* found the OCCA had denied the jury sentence to which he was entitled "simply on the frail conjecture that a jury *might* have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision. Such an arbitrary disregard of the petitioner's right to liberty is a denial of due process of law." *Id.*, 447 U.S., at 346, 100 S.Ct., at 2229. Thereafter, in *Cabana v. Bullock*, 474 U.S. 376, 378, n.4, 106 S.Ct. 689, 697, n. 4, 88 L.Ed.2d 704 (1986) (overruled on other grounds by *Pope v. Illinois*, 481 U.S. 497, 503-504 (1987)), the Court rejected a due process challenge based on *Hicks* because the defendant "had no state-law entitlement at the time of his trial to have the jury" make findings which an appellate court could also make. *See also*, *Clemons v. Mississippi*, 494 U.S. 738, 746, 110 S.Ct. 1441, 1447, 108 L.Ed.2d 725 (1990)(rejecting argument that an appellate court cannot reweigh the mitigating and aggravating factors where a jury found and relied on an invalid aggravating factor. In *Murphy I,* the OCCA made it clear that the standard adopted therein would only apply until such time as the Oklahoma legislature had an opportunity to enact new legislation consistent with *Atkins*. The Oklahoma legislature acted within a very short time thereafter and the state statute subsequently enacted precludes Petitioner from receiving a jury trial.

Clearly, "[t]he states retain the discretion to set gateways to full consideration and to define the manner in which habeas petitioners may develop their claims," *Blue v. Thaler*, 665 F.3d 647, 657 (5th Cir. 2011), so long as petitioner has not made a *prima facie* valid *Atkins* claim. In this case, the cut-off score set by Oklahoma is higher than the cut-off score discussed in either *Atkins* or *Hall*. Additionally, as can be seen from the findings of fact throughout Petitioner's state court proceedings, it is clear the Oklahoma courts considered much more than just the petitioner's IQ scores. Evidence introduced during the second stage proceedings for purposes of mitigation indicated, among other things, that Petitioner had a very strong employment history, *i.e.*, he has been an 'excellent' employee with few attendance problems; he did well in school; he could have some amount of brain damage due to excessive drinking; and he graduated from high school with a 3.0 grade point average and had a 2.9 grade point average for the classes he took in college. *Murphy II*, at 563. Thereafter, during Petitioner's first application for post-conviction relief, in considering the definition of "mentally retarded," the OCCA found

> . . . . the record clearly indicates Petitioner's intelligence does not *substantially* limit his ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses and to understand the reaction of others. Furthermore, . . . . . the record clearly indicates Petitioner does not have *significant* limitations in adaptive functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.

*Murphy III*, at p. 459.

Despite these specific factual findings in *Murphy IV*, as set out above, a majority of the OCCA found Plaintiff had presented sufficient evidence in his second post-conviction application to raise a factual issue on the question of mental retardation without any factual findings contradicting any of these earlier factual findings. *Murphy IV*, at 1208. After considering all of the evidence which Petitioner was prepared to present on this issue, however, the trial court found the Petitioner had not met the statutory requirements to fall within the definition of "mental retardation." The trial judge's findings took into account that the lowest IQ score obtained by petitioner was on an "abbreviated" test. Further, the full scale tests taken by petitioner yielded IQ scores of 80 and 82, which is substantially higher than the 70-75 IQ score range recognized by *Atkins* and *Hall*. Petitioner presents no clearly established federal law holding that an individual with a full IQ score over 75 falls within the "range of mentally retarded offenders about whom there is a national consensus" that they should not be executed. Moreover, the trial judge found, as indicated above, that Petitioner's alcoholism directly impacted the abbreviated test and, therefore, the test was not reliable due to the jail conditions, the incomplete testing and recent alcohol use. *See*, *Murphy III*, at 458. Additionally, the trial court found the elementary school testing did not demonstrate mental retardation, only some academic weakness. *Id*. Finally, the record in this case establishes Petitioner "graduated from high school with a 3.0 grade point average and had a 2.9 grade point average for the classes he took in college; . . . ." *Murphy II*, 54 P.3d, at 563 (legal procedures adopted to resolve future *Atkins* claims were superceded in *Blonner*

*v. State*, 127 P.3d 1135 (Okla. Crim. App. 2006)).  As can be seen throughout the various proceedings held in Petitioner's case, the Oklahoma courts considered more than just Petitioner's raw I.Q. test scores.  Petitioner simply failed to make a threshold showing of mental retardation during his numerous state court proceedings on this issue.  Based upon the facts in this case, this Court finds Petitioner has failed to establish that the OCCA's decision was contrary to, or an unreasonable application of, clearly established federal law.  Moreover, Petitioner has failed to establish that the adjudication of his claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Accordingly, Petitioner's claim is denied.

## IV. *EX POST FACTO* CHALLENGE

Petitioner also argues the retrospective application of Oklahoma's 2006 statute to his mental retardation claim violates the *ex post facto* clause of the United States Constitution and violates due process.  While Respondent concedes Petitioner's *ex post fact* claim was exhausted in state court, Petitioner argues the OCCA did not consider whether the statute and its interpretation violated the United States Constitution.  Rather, petitioner claims the OCCA only adjudicated the state constitutional claim and, therefore, the federal constitutional claim is subject to *de* novo review by this Court.  As to the due process claim, Respondent asserts it is unexhausted.  In his reply, Petitioner argues the claim was exhausted.

Although the OCCA, in considering this claim, said it was interpreting "the *ex post facto* provisions in Article II, Section 15 of the Oklahoma Constitution,"[6] the court continued its analysis by stating:

> A law is ex post facto if it (1) criminalizes an act after the act has been committed; (2) increases the severity of the crime after it has been committed; (3) increases the punishment for a crime after it has been committed; or (4) alters the rules of evidence, allowing conviction on less or different testimony than the law required at the time the act was committed. *See Carmell v. Texas,* 529 U.S. 513, 522, 120 S.Ct. 1620, 1627-1629, 146 L.Ed.2d 577 (2000); and *Calder v. Bull*, 3 U.S. 386, 390, 1 L.Ed.648 (1798).

> \* \* \* \*\*

> 'The mere fact that a retroactively-applied change in evidentiary rules works to a defendant's disadvantage does not mean the law is *ex post facto*. The issue is whether the change affected the quantum of evidence necessary to support a conviction." *James*, 2009 OK CR 8, ¶ 6, 204 P.3d at 795 (*citing Carmell*, 529 U.S. at 546-47, 120 S.Ct. 15 1640).

> \* \* \* \* \*

We find that the District Court's application of § 701.10b(C) does not increase the severity of the crime or increase the punishment for the crime after it has been committed. The punishment for first degree murder remains death, imprisonment for life without parole or imprisonment for life. 21 O.S. 2011, § 701.9.

The challenged statutory provision neither changes the quantum of evidence necessary for a conviction nor expands the scope of criminal prohibition by abolishing an affirmative defense or excuse. Section 701.10b(C) does not enhance Petitioner's punishment or cause him to be eligible for a death sentence. Instead, the challenged statutory provision sets forth the threshold showing a defendant must show to be entitled to

---

[6] The *ex post facto* requirements of the Oklahoma constitution are similar to the United States Constitution's requirements with the Oklahoma Constitution providing "[n]o . . . . ex post facto law . . . . shall ever be passed." Oklahoma Constitution Art. 2, § 15. The United States Constitution provides that "[n]o State shall . . . . pass any . . . ex post facto Law. . . ." U.S. Const. Art. 1, § 10, cl.1.

have his claim of mental retardation adjudicated.  *Smith*, 2010 OK CR 24, ¶ 10, 245 P.3d at 1237.

> As § 701.10b(C) does not fall within any of the delineated *ex post facto* prohibitions, the District Court properly applied it to Petitioner's case. Petitioner has not proven that § 701.10b is unconstitutional.

*Murphy V*, 281 P.3d at 1294.  Based upon the OCCA's analysis, this Court finds the standard employed in adjudicating this claim is identical to the federal standard. Moreover, the OCCA's decision is based on substantive grounds and is, therefore, entitled to AEDPA deference.  *Harrington v. Richter*, 562 U.S. 86, 98-99, 131 S.Ct. 770, 784-785, 178 L.Ed.2d 624 (2011).

Despite the OCCA's finding that § 701.10b applies to him, Petitioner asserts the Oklahoma statute, which became effective on July 1, 2006, was never meant to apply retrospectively to individuals, like him, who had previously been convicted and sentenced to death for a crime that occurred in 1999.   A state court's interpretation of its laws, however, is binding on this Court.  *Chapman v. LeMaster*, 302 F.3d 1189, 1196 (10th Cir. 2002).

Even though the words '*ex post facto laws*' are technical terms, they apply to criminal laws and mean

> every law that made an act done before the passing of the law, and which was innocent when done, criminal; or which aggravated a crime, and made it greater than it was when committed; or which changed the punishment and inflicted a greater punishment than the law annexed to the crime when committed; or which altered the legal rules of evidence, and received less or different testimony than the law required at the time of the commission of the offence, in order to convict the offender.  (citation omitted)

*Carmell*, supra, 529 U.S., at 524-25, 120 S.Ct., at 1628.

Respondent correctly notes that, unlike the typical *ex post facto* case, § 701.10b(C) applies to civil mental retardation trials which had not taken place at the time the statute was enacted. While the OCCA struggled to ensure compliance with *Atkins* by adopting new procedures to be implemented immediately until the legislature could enact new legislation, § 701.10b did nothing to alter the quantum of evidence necessary for a conviction, the possible punishments available upon conviction of first degree murder, nor did it make any act done before the passing of the law criminal which had not previously been deemed criminal. Furthermore, in *Rogers v. Tennessee*, 532 U.S. 451, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), the United States Supreme Court stated:

> The *Ex post Facto Clause,* by its own terms, does not apply to courts. Extending the Clause to courts through the rubric of due process thus would circumvent the clear constitutional text. It also would evince too little regard for the important institutional and contextual differences between legislating, on the one hand, and common law decisionmaking, on the other.

*Id*., 532 U.S., at 460, 121 S.Ct., at 1699. The Court did recognize, however, that "limitations on *ex post facto* judicial decisionmaking are inherent in the notion of due process." *Id*., 532 U.S., at 457, 121 S.Ct., at 1697. Since the statute at issue did not change the criminal law and Petitioner was afforded a hearing regarding his mental retardation claim, this Court finds no due process violation occurred by the enactment of § 701.10b. Therefore, this Court finds the decision of the OCCA was not contrary to, nor did it involve an unreasonable application of Supreme Court law. Accordingly, Petitioner is not, pursuant to 28 U.S.C. § 2254(d), entitled to relief on this issue.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, Petitioner argues his attorneys were ineffective for failing to raise certain issues during the remanded mental retardation proceedings and on appeal to the OCCA. Petitioner did not raise this claim in state court and the Respondent has not waived exhaustion of the claim. Petitioner also argues that ineffective assistance of counsel constitutes cause to excuse his procedural default. Respondent asserts because Petitioner can not prevail on the merits of his claims, he cannot prevail on his ineffective assistance of counsel claim and, therefore, the court should, pursuant to 28 U.S.C. § 2254(b)(2), deny this claim on the merits.

To the extent this Court has not found merit in Petitioner's underlying claims, this Court finds a determination of whether ineffective assistance of counsel can serve as cause excusing petitioner's procedural default is unnecessary. *Hooks v.* Ward, 184 F.3d 1206, 1221 (10th Cir. 1999). Accordingly, this claim is denied.


## V. CONCLUSION

For the reasons stated herein, Petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. # 10) is hereby denied. Additionally, pursuant to Rule 11 of the Rules Governing Section 2254 cases, this Court hereby denies a certificate of appealability. The Clerk is hereby directed to enter a separate judgment in this matter.

Dated this 5th day of May, 2015.

Ronald A. White
United States District Judge
Eastern District of Oklahoma